James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel.: (973) 994-1700
jcecchi@carellabyrne.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROBERT KLINER, DEANNA DUBE, RICARDO ALAMILLA, JORDAN HAYES, SHARON RUSHING, PAUL SNOW, and LOREN SKINNER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CONDUENT BUSINESS SERVICES, LLC and HEALTH CARE SERVICE CORPORATION,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Robert Kliner, Deanna Dube, Ricardo Alamilla, Jordan Hayes, Sharon Rushing, Paul Snow, and Loren Skinner ("Plaintiffs"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through their attorneys, bring this Class Action Complaint against Defendants Conduent Business Services, LLC ("Conduent") and Health Care Service Corporation ("HCSC" and with Conduent, "Defendants"), and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiffs bring this class action against Defendants for their failure to secure and safeguard approximately 10,515,849 individuals', including Plaintiffs', personally identifying information ("PII") and personal health information ("PHI"), including names, addresses, dates of birth, Social Security numbers, medical information, treatment and diagnosis description codes, treatment costs, dates of admission or discharge, member identification number, and claim numbers.

2. Conduent provides digital business solutions to commercial and governmental clients. HCSC is the largest customer-owned health insurer in the United States, and a client of Conduent.

3. Between approximately October 21, 2024 and January 13, 2025, an unauthorized third party gained access to Conduent's network systems and acquired files containing the PII/PHI of customers of Conduent's clients, including Plaintiffs and Class members (the "Data Breach").

4. Defendants owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to, or sharing PII/PHI with third parties that failed to, implement and maintain reasonable security procedures and practices to protect Plaintiffs' and Class members' PII/PHI from unauthorized access and disclosure.

5. As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII/PHI was exposed as a result of the Data Breach.

6. Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, negligence per se, breach of implied contract, unjust enrichment, violations of the California Unfair Competition Law, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and seek

declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Robert Kliner***

7. Plaintiff Kliner is a citizen and resident of California.

8. Plaintiff Kliner is a customer of HCSC through his health insurance from Blue Cross and Blue Shield of Illinois ("BCBSIL"), a division of HCSC.

9. As a condition of receiving insurance services from HCSC, HCSC required Plaintiff Kliner to provide it with his PII/PHI. HCSC in turn shared Plaintiff Kliner's PII/PHI with Conduent in connection with receiving services from Conduent.

10. Plaintiff Kliner believed that HCSC and its vendors had implemented and maintained reasonable security procedures and practices to protect his PII/PHI. With this belief in mind, Plaintiff Kliner provided his PII/PHI to HCSC in exchange for receiving insurance services from HCSC.

11. At all relevant times, Defendants stored and maintained Plaintiff Kliner's PII/PHI, which was accessed and stolen by cybercriminals in the Data Breach.

12. Plaintiff Kliner received a letter from Conduent notifying him that his PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

13. In January and February 2025, the months immediately following the Data Breach, Plaintiff Kliner began suffering from a large influx of spam calls, texts, and emails. The amount of spam became so unbearably large that Plaintiff Kliner paid $90 for a yearly plan from a data broker removal service in an attempt to stem the tide of spam.

14. In addition, Plaintiff Kliner has spent time and effort researching the Data Breach, including to confirm the legitimacy of the notice letter, and monitoring his accounts for signs of fraud or identity theft.

15. As a direct result of the Data Breach, Plaintiff Kliner has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of his PII/PHI.

***Plaintiff Deanna Dube***

16. Plaintiff Dube is a citizen and resident of Nevada.

17. Plaintiff Dube is a customer of HCSC through her health insurance from BCBSIL, a division of HCSC.

18. As a condition of receiving insurance services from HCSC, HCSC required Plaintiff Dube to provide it with her PII/PHI. HCSC in turn shared Plaintiff Dube's PII/PHI with Conduent in connection with receiving services from Conduent.

19. Plaintiff Dube believed that HCSC and its vendors had implemented and maintained reasonable security procedures and practices to protect her PII/PHI. With this belief in mind, Plaintiff Dube provided her PII/PHI to HCSC in exchange for receiving insurance services from HCSC.

20. At all relevant times, Defendants stored and maintained Plaintiff Dube's PII/PHI, which was accessed and stolen by cybercriminals in the Data Breach.

21. Plaintiff Dube received a letter from Conduent notifying her that her PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

22. Since the Data Breach, Plaintiff Dube has suffered from a large influx of spam calls, texts, and emails.

23. As a direct result of the Data Breach, Plaintiff Dube has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her

highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII/PHI.

***Plaintiff Ricardo Alamilla***

24. Plaintiff Alamilla is a citizen and resident of Texas.

25. Plaintiff Alamilla is a customer of HCSC through his health insurance from Blue Cross and Blue Shield of Texas ("BCBSTX"), a division of HCSC.

26. As a condition of receiving insurance services from HCSC, HCSC required Plaintiff Alamilla to provide it with his PII/PHI. HCSC in turn shared Plaintiff Alamilla's PII/PHI with Conduent in connection with receiving services from Conduent.

27. Plaintiff Alamilla believed that HCSC and its vendors had implemented and maintained reasonable security procedures and practices to protect his PII/PHI. With this belief in mind, Plaintiff Alamilla provided his PII/PHI to HCSC in exchange for receiving insurance services from HCSC.

28. At all relevant times, Defendants stored and maintained Plaintiff Alamilla's PII/PHI, which was accessed and stolen by cybercriminals in the Data Breach.

29. Plaintiff Alamilla received a letter from Conduent notifying him that his PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

30. Since the Data Breach, Plaintiff Alamilla has suffered from a large influx of spam calls, texts, and emails. In addition, Plaintiff Alamilla has spent time and effort researching the Data Breach, including to confirm the legitimacy of the notice letter, and monitoring his accounts for signs of fraud or identity theft.

31. As a direct result of the Data Breach, Plaintiff Alamilla has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of his PII/PHI.

***Plaintiff Jordan Hayes***

32. Plaintiff Hayes is a citizen and resident of Illinois.

33. Plaintiff Hayes is a customer of HCSC through his health insurance from Blue Cross and Blue Shield of Illinois ("BCBSIL"), a division of HCSC.

34. As a condition of receiving insurance services from HCSC, HCSC required Plaintiff Hayes to provide it with his PII/PHI. HCSC in turn shared Plaintiff Hayes's PII/PHI with Conduent in connection with receiving services from Conduent.

35. Plaintiff Hayes believed that HCSC and its vendors had implemented and maintained reasonable security procedures and practices to protect his PII/PHI.

With this belief in mind, Plaintiff Hayes provided his PII/PHI to HCSC in exchange for receiving insurance services from HCSC.

36. At all relevant times, HCSC and its vendors stored and maintained Plaintiff Hayes's PII/PHI, which was accessed and stolen by cybercriminals in the Data Breach.

37. Plaintiff Hayes received a letter from Conduent notifying him that his PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

38. Since the Data Breach, Plaintiff Hayes has suffered from a large influx of spam calls, texts, and emails. In addition, Plaintiff Hayes has spent time and effort researching the Data Breach, including to confirm the legitimacy of the notice letter, and monitoring his accounts and checking his credit report for signs of fraud or identity theft.

39. Following the Data Breach, Plaintiff Hayes experienced numerous fraudulent attempts to log into various accounts, including his bank account, using an email address associated with his BCBSIL account.

40. As a direct result of the Data Breach, Plaintiff Hayes has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his

highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of his PII/PHI.

***Plaintiff Sharon Rushing***

41. Plaintiff Rushing is a citizen and resident of Texas.

42. Plaintiff Rushing is a customer of HCSC through her health insurance from BCBSIL, a division of HCSC.

43. As a condition of receiving insurance services from HCSC, HCSC required Plaintiff Rushing to provide it with her PII/PHI. HCSC in turn shared Plaintiff Rushing's PII/PHI with Conduent in connection with receiving services from Conduent.

44. Plaintiff Rushing believed that HCSC and its vendors had implemented and maintained reasonable security procedures and practices to protect her PII/PHI. With this belief in mind, Plaintiff Rushing provided her PII/PHI to HCSC in exchange for receiving insurance services from HCSC.

45. At all relevant times, Defendants stored and maintained Plaintiff Rushing's PII/PHI, which was accessed and stolen by cybercriminals in the Data Breach.

46. Plaintiff Rushing received a letter from Conduent notifying her that her PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

47. Since the Data Breach, Plaintiff Rushing has suffered from a large influx of spam calls and emails.

48. As a direct result of the Data Breach, Plaintiff Rushing has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII/PHI.

***Plaintiff Paul Snow***

49. Plaintiff Snow is a citizen and resident of Texas.

50. Plaintiff Snow is a customer of HCSC through his health insurance from Blue Cross and Blue Shield of Texas ("BCBSTX"), a division of HCSC.

51. As a condition of receiving insurance services from HCSC, HCSC required Plaintiff Snow to provide it with his PII/PHI. HCSC in turn shared Plaintiff Snow's PII/PHI with Conduent in connection with receiving services from Conduent.

52. Plaintiff Snow believed that HCSC and its vendors had implemented and maintained reasonable security procedures and practices to protect his PII/PHI. With this belief in mind, Plaintiff Snow provided his PII/PHI to HCSC in exchange for receiving insurance services from HCSC.

53. At all relevant times, Defendants stored and maintained Plaintiff Snow's PII/PHI, which was accessed and stolen by cybercriminals in the Data Breach.

54. Plaintiff Snow received a letter from Conduent notifying him that his PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

55. Plaintiff Snow was the victim of fraud as a result of the Data Breach. After the Data Breach occurred, Plaintiff Snow experienced fraudulent charges on his credit card, forcing him to cancel the card.

56. Since the Data Breach, Plaintiff Snow has suffered from a large influx of spam calls, texts, and emails. In addition, Plaintiff Snow has spent time and effort researching the Data Breach, including to confirm the legitimacy of the notice letter, monitoring his accounts for signs of fraud or identity theft, and changing passwords.

57. As a direct result of the Data Breach, Plaintiff Snow has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of his PII/PHI.

***Plaintiff Loren Skinner***

58. Plaintiff Skinner is a citizen and resident of Texas.

59. Plaintiff Skinner is a customer of HCSC through her health insurance from BCBSTX, a division of HCSC.

60. As a condition of receiving insurance services from HCSC, HCSC required Plaintiff Skinner to provide it with her PII/PHI. HCSC in turn shared Plaintiff Skinner's PII/PHI with Conduent in connection with receiving services from Conduent.

61. Plaintiff Skinner believed that HCSC and its vendors had implemented and maintained reasonable security procedures and practices to protect her PII/PHI. With this belief in mind, Plaintiff Skinner provided her PII/PHI to HCSC in exchange for receiving insurance services from HCSC.

62. At all relevant times, Defendants stored and maintained Plaintiff Skinner's PII/PHI, which was accessed and stolen by cybercriminals in the Data Breach.

63. Plaintiff Skinner received a letter from Conduent notifying her that her PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

64. Since the Data Breach, Plaintiff Skinner has suffered from a large influx of spam calls, texts, and emails.

65. As a direct result of the Data Breach, Plaintiff Skinner has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity

theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII/PHI.

***Defendant Conduent Business Services, LLC***

66. Defendant Conduent Business Services, LLC is a Delaware corporation with its principal place of business located at 100 Campus Drive, Suite 200 Florham Park, NJ 07932.

***Defendant Health Care Service Corporation***

67. Defendant Health Care Service Corporation is an Illinois corporation with its principal place of business located at 300 E Randolph St, Chicago, IL 60601.

## JURISDICTION AND VENUE

68. The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

69. This Court has general personal jurisdiction over Conduent because it maintains its principal place of business in this State. This Court has personal jurisdiction over HCSC because it conducts business in this State and contracts for goods or services in this State.

70. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Conduent's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Defendants*

71. Conduent is a "a third-party service provider that offers printing/mailroom services, document processing services, payment integrity services, government benefit services, and other back-office support services."[1]

72. HCSC "is the largest customer-owned health insurer in the United States, serving 23.2 million members and managing nearly $122.7 billion of medical spend in 2024."[2] HCSC operates licensed Blue Cross and Blue Shield plans in Illinois, Montana, New Mexico, Oklahoma, and Texas, including BCBSIL and BCBSTX.[3]

73. HCSC contracts for services from Conduent. In connection with those services, HCSC shares its customers' PII/PHI with Conduent.

---

[1] *Notice of Data Incident*, CONDUENT, https://www.conduent.com/notice-2912609/ (last accessed Nov. 14, 2025).

[2] *At a Glance*, HCSC (Dec. 31, 2024), https://www.hcsc.com/documents/hcsc-glance_2024.pdf.

[3] *2024 Annual Report*, HCSC (2024), https://www.hcsc.com/documents/hcsc-annual-report-2024.pdf.

74. In the regular course of its business, HCSC collects and maintains the PII/PHI of its customers, including Plaintiffs and Class members. HCSC requires customers to provide it with their PII/PHI, including the PII/PHI stolen in the Data Breach, before it provides them insurance services. In the regular course of its business, HCSC also shares its customers' PII/PHI with certain vendors.

75. In the regular course of its business, Conduent collects and maintains the PII/PHI of its clients' customers, including Plaintiffs and Class members. Conduent requires clients to provide it with their customers' PII/PHI, including the PII/PHI stolen in the Data Breach, in connection with providing business services.

76. On each of its BCBS-licensed insurance provider websites, HCSC maintains a substantively identical HIPAA Notice of Privacy Practices ("Privacy Notice") that describes how HCSC may use and disclose their customers' PII/PHI.[4]

77. In the Privacy Notice, HCSC represents it is "committed to protecting your privacy and understands the importance of safeguarding medical information."[5] HCSC admits it is "required by the Health Insurance Portability and Accountability

[4] *See HIPAA Notice of Privacy Practices*, BCBSIL (Oct. 1, 2022), https://www.bcbsil.com/il/documents/privacy/il-privacy-practices-notice.pdf; *HIPAA Notice of Privacy Practices*, BCBSTX (Oct. 1, 2022), https://www.bcbstx.com/tx/documents/privacy/tx-privacy-practices-notice.pdf.
[5] *Id.*

Act (HIPAA) to maintain the privacy of your protected health information (PHI) that identifies you or could be used to identify you."[6]

78. HCSC explains in the Privacy Notice that it may only share its customers' PII/PHI in limited circumstances. HCSC represents that it may disclose PII/PHI "to a Business Associate which is an entity or person that performs activities or services on our behalf that involve the use, disclosure, access, creation, or storage of PHI."[7] However, HCSC promises it will "require a Business Associate to execute appropriate agreements before they initiate these activities or services."[8]

79. HCSC admits it is subject to state and federal laws regarding the use and disclosure of PII/PHI, and promises customers it "follow[s] the applicable requirements of these laws."[9]

80. HCSC acknowledges it has "responsibilities and legal obligations to," among other things, "[m]aintain the privacy and security of your PHI," "[n]otify you in the event you are affected by a breach of unsecured PHI," "[r]efrain from using or disclosing PHI in any manner not described in this notice unless you authorize us to do so in writing," and "[a]bide by the terms of this current notice."

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*

81. HCSC further promises it "[m]aintain[s] security and privacy practices that include physical, technical, and administrative safeguards to protect this information from unauthorized access."[10]

82. HCSC maintains substantively identical Code of Ethics and Conduct for Vendors for each BCBS provider, describing its "values and commitments" with respect to third-party vendors like Conduent.[11] HCSC represents that it does business with vendors who "[p]rotect the privacy and confidentiality of information entrusted to us."[12]

83. HCSC states it "is committed to obeying the law" and requires vendors to "comply with all federal, state and local laws and regulations applicable to Vendor's business and the rendering of services to our company," including HIPAA, among others.[13]

84. HCSC represents it "takes its obligation to protect [PII/PHI] very seriously."[14] It further states, "Vendors have a responsibility to manage risk and

[10] *Id.*

[11] *See Code of Ethics and Conduct for Vendors*, BCBSIL (Aug. 2025), https://www.bcbsil.com/il/documents/compliance/code-conduct-vendor-il.pdf; *Code of Ethics and Conduct for Vendors*, BCBSTX (Aug. 2025), https://www.bcbstx.com/docs/compliance/tx/code-conduct-vendor-tx.pdf.

[12] *Id.*

[13] *Id.*

[14] *Id.*

implement reasonable and appropriate security measures. Vendors must comply with applicable laws and contractual requirements regarding" PII/PHI.[15]

85. Conduent maintains a Conduent Code of Business Conduct, in which Conduent represents:

> We respect and are committed to safeguarding the confidentiality, data privacy and security of information that our customers have entrusted to us, including confidential information, personally identifiable information . . . We exercise appropriate care at all times to prevent unauthorized disclosure and use of customer information. We take our responsibilities for customer confidentiality, data privacy and security seriously and implement appropriate safeguards for the use and handling of this information in accordance with our information security and privacy policies and in accordance with all applicable laws.[16]

86. HCSC also maintains a substantively identical Code of Ethics and Conduct for each BCBS provider.[17] HCSC states PII/PHI "should only be shared with or accessed by authorized parties both inside and outside of the Company and in compliance with applicable federal and state laws."[18] HCSC admits the "[t]he improper use or disclosure of PII can . . . [d]amage an individual's reputation, cause

---

[15] *Id.*

[16] *Conduent Code of Business Conduct*, CONDUENT, https://downloads.conduent.com/content/usa/en/document/Code-of-Conduct_032825_English.pdf (last accessed Nov. 14, 2025).

[17] *Code of Conduct and Ethics*, BCBSIL (Aug. 2025), https://www.bcbsil.com/il/documents/compliance/code-conduct-il.pdf; Code of Conduct and Ethics, BCBSTX (Aug. 2025), https://www.bcbstx.com/docs/compliance/tx/code-conduct-tx.pdf.

[18] *Id.*

embarrassment, or result in identity theft" and "[v]iolate federal or state privacy and security laws."[19]

87. HCSC admits "[p]rotecting your private health information is our responsibility."[20]

88. Conduent maintains a Privacy Notice which applies to "the collection, use and disclosure of information that we collect from vendors, clients, individuals and entities who contact us."[21] Conduent represents its "commitment to data privacy goes beyond the minimum legal and regulatory requirements and strives for best-in-class data protection and privacy management."[22] Conduent also promises it "maintains the information it receives online in strict confidence."[23]

89. Conduent claims it only retains PII/PHI for legitimate business needs, and once it has "no ongoing legitimate business need to process your personal information, we will either delete or anonymise it or . . . securely store your personal information and isolate it from any further processing until deletion is possible."[24]

---

[19] *Id.*

[20] *Keeping Your Health Data and Personal Information Safe is Our Goal*, BCBSIL, https://www.bcbsil.com/about-us/cybersecurity (last accessed Nov. 14, 2025); *Keeping Your Health Data and Personal Information Safe is Our Goal*, BCBSTX, https://www.bcbstx.com/about-us/cybersecurity (last accessed Nov. 14, 2025).

[21] *Data Privacy at Conduent*, CONDUENT (Oct. 15, 2023), https://www.conduent.com/privacy-policy/ (last accessed Nov. 14, 2025) ("*Privacy Notice*").

[22] *Id.*

[23] *Id.*

[24] *Id.*

90. Conduent's Privacy Notice states:

> Conduent's security program is aligned with applicable industry regulatory requirements, including but not limited to NIST, HITRUST, GDPR, HIPAA, ISO, and PCI. . . . It is continuously reviewed and strengthened as necessary to ensure responsiveness to and protection against emerging threats. Conduent maintains a highly qualified workforce and utilizes external experts to support the program. We administer internal education, training, and communication programs to ensure ongoing awareness and vigilance. We maintain and communicate formal documented policies and standards. We monitor and assess the overall operating effectiveness of our program through risk assessments that include identification and remediation of vulnerabilities and threats. We maintain and test our cyber incident response plan, and undertake various independent reviews in conjunction with PCI DSS, external audits, internal audits, and client assurance efforts. Various additional operational protections, controls, and processes exist, including but not limited to malware protection, intrusion prevention, and detection protocols, user access reviews, network segmentation, implementation and maintenance of network and application firewalls, vulnerability scanning, data encryption, penetration testing, and patching.[25]

91. Plaintiffs and Class members entrusted HCSC with their PII/PHI in exchange for receiving insurance services and HCSC provided this PII/PHI to Conduent.

### *The Data Breach*

92. Between approximately October 21, 2024 and January 13, 2025—nearly three months—an unauthorized third party gained access to Conduent's network systems and accessed and acquired files containing the PII/PHI of Conduent's

[25] *Id.*

clients' customers, including at least names, Social Security numbers, medical information, and health insurance information.[26] Other affected entities have further clarified information such as "dates of birth, treatment/diagnosis description or code, treatment cost, date of admission/discharge, member identification number and/or claim number" were impacted.[27]

93. Despite the fact that the Data Breach occurred between approximately October 21, 2024 and January 13, 2025, Conduent waited until approximately October 24, 2025—over nine months after discovering the Data Breach—to begin notifying Plaintiffs and Class members that the Data Breach occurred and that their PII/PHI was accessed and acquired by unauthorized persons.[28]

94. Defendants acknowledge that the Data Breach places Plaintiffs and Class members in imminent danger of fraud and identity. In its data breach notice letter, Conduent advises Plaintiffs and Class members "to remain vigilant against the potential for identity theft and fraud and to monitor your credit reports for any suspicious activity."[29]

---

[26] *Notice of Data Incident*, *supra* note 1.
[27] *Premera Blue Cross Responds to Conduent Data Security Incident*, PR NEWSWIRE (Oct. 23, 2025 7:51 PM), https://www.prnewswire.com/news-releases/premera-blue-cross-responds-to-conduent-data-security-incident-302592987.html.
[28] *See Conduent Business Services, LLC Data Breach Notification*, Maine.gov (Oct. 24, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/389e9d0d-8e23-497d-aaab-1c4c8a80707f.html.
[29] *See id.*

95. The SafePay ransomware group claimed responsibility for the Data Breach and added Conduent to its dark web data breach site, where it made the stolen data available for download.[30]

96. Defendants' failure to promptly notify Plaintiffs and Class members that their PII/PHI was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiffs and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiffs and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***Defendants Knew that Criminals Target PII/PHI***

97. At all relevant times, Defendants knew, or should have known, that the PII/PHI that they collected, shared, and stored was a target for malicious actors. Despite such knowledge, Defendants failed to, or shared PII/PHI with third parties that failed to, implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII/PHI from

[30] Steve Alder, *Conduent Anticipates Data Breach Cost to Rise to $50M by Q1, 2026*, HIPAA J. (Nov. 11, 2025), https://www.hipaajournal.com/conduent-business-solutions-data-breach/; Pieter Arntz, *Ransomware gang claims Conduent breach: what you should watch for next [updated]*, MALWAREBYTES (Oct. 30, 2025), https://www.malwarebytes.com/blog/news/2025/10/ransomware-gang-claims-conduent-breach-what-you-should-watch-for-next.

unauthorized disclosures and cyberattacks that they should have anticipated and guarded against.

98. It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[31]

99. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in 2024.[32] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[33]

---

[31] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[32] Denyl Green, *Data Breach Outlook*, KROLL (Feb. 18, 2025), https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025.

[33] *See id*.

100. PII/PHI is a valuable property right.[34] The value of PII/PHI as a commodity is measurable.[35] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[36] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[37] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

101. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social

---

[34] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[35] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[36] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[37] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

102. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[38] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[39]

103. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[40] According to a report released by the Federal Bureau of Investigation's ("FBI")

---

[38] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[39] *Id.*

[40] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[41]

104. Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[42] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[43]

105. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[44]

---

[41] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[42] Steager, *supra* note 38.

[43] *Id.*

[44] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

106. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

107. Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[45] [46]

108. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts

[45] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 14, 2025).

[46] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[47]

109. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[48]

110. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[49] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[50] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other

[47] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[48] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Nov. 14, 2025).

[49] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[50] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 41.

medical care."[51] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[52]

111. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

> a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.
>
> b. Significant bills for medical goods and services neither sought nor received.
>
> c. Issues with insurance, co-pays, and insurance caps.
>
> d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.
>
> e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.
>
> f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

---

[51] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Nov. 14, 2025).

[52] *Id*.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[53]

112. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[54]

113. It is within this context that Plaintiffs and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiffs and Class Members***

114. Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of

[53] *See* Dixon & Emerson, *supra* note 49.

[54] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

identity theft; (ii) the disclosure, compromise, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## CLASS ALLEGATIONS

115. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

116. Plaintiffs bring this action on behalf of themselves and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

117. Plaintiff Kliner also brings this action on behalf of himself and the following subclass of similarly situated persons:

> **California Subclass**
> All residents of California whose personally identifiable information or personal health information was accessed in the Data Breach by

unauthorized persons, including all persons who were sent a notice of the Data Breach.

118. Plaintiff Hayes also brings this action on behalf of himself and the following subclass of similarly situated persons:

**<u>Illinois Subclass</u>**
All residents of Illinois whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

119. Excluded from the Class are Conduent Business Services, LLC and its affiliates, parents, subsidiaries, officers, agents, and directors; Health Care Service Corporation and its affiliates, parents, subsidiaries, officers, agents, and directors; as well as the judge(s) presiding over this matter and the clerks of said judge.

120. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

121. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Conduent reported to the Oregon Department of Justice that the Data Breach affected approximately 10,515,849 individuals.[55]

---

[55] *Search Data Breaches*, OR. DEP'T JUSTICE (Oct. 24, 2025), https://justice.oregon.gov/consumer/DataBreach/.

122. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendants had a duty not to disclose the PII/PHI of Plaintiffs and Class members to unauthorized third parties;

c. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII/PHI;

d. Whether Defendants breached those duties to protect Plaintiffs' and Class members' PII/PHI; and

e. Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

123. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

124. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs'

claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

125. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

126. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I
## NEGLIGENCE

127. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

128. Defendants owed a duty to Plaintiffs and all other Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in their possession, custody, or control.

129. Defendants knew, or should have known, the risks of collecting, sharing, and storing Plaintiffs' and Class members' PII/PHI, and the importance of maintaining secure systems. Defendants knew, or should have known, of the many data breaches that targeted organizations storing PII/PHI in recent years.

130. Given the nature of Defendants' businesses, the sensitivity and value of the PII/PHI they collect, share, and maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities in their systems and prevented the Data Breach from occurring.

131. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to, or sharing PII/PHI with third parties that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to

safeguard and protect PII/PHI entrusted to them—including Plaintiffs' and Class members' PII/PHI.

132. It was, or should have been, reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to, or sharing PII/PHI with third parties that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

133. Additionally, Defendants had an obligation to provide prompt and accurate notice of the Data Breach to Plaintiffs and Class members. Defendants knew that the PII/PHI accessed by cybercriminals in the Data Breach was highly sensitive and can be used to commit identity theft and fraud using Plaintiffs' and Class members' PII/PHI, which would cause substantial harm to Plaintiffs and Class members.

134. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII/PHI would not have been compromised.

135. As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and all other Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE PER SE

136. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

137. Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R.

Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

138. Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

139. Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and all other Class members' PII/PHI, not providing notice to Plaintiffs and Class members within 60 days of the Data Breach, and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI they obtain and store, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiffs and the other Class members.

140. Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

141. Plaintiffs and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

142. The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

143. It was, or should have been, reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

144. It was, or should have been, reasonably foreseeable to Defendants that their failure to provide notice to Plaintiffs and Class members that their PII/PHI had been accessed by unauthorized individuals within 60 days of the Data breach, would result in harm to Plaintiffs and Class members.

145. The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiffs and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of

their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF IMPLIED CONTRACT
***On behalf of Plaintiffs and the Class against HCSC Only***

146. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

147. Plaintiffs bring this claim on behalf of themselves and Class members against HCSC only.

148. In connection with receiving insurance services, Plaintiffs and all other Class members entered into implied contracts with HCSC.

149. Pursuant to these implied contracts, Plaintiffs and Class members paid money to HCSC, provided HCSC with their PII/PHI. In exchange, HCSC agreed to, among other things, and Plaintiffs and Class members understood that HCSC would: (1) provide insurance services to Plaintiffs and Class members; (2) collect, maintain,

and utilize Plaintiffs' and Class members' PII/PHI to, among other things, facilitate treatment, the provision of services, and payment services to Plaintiffs and Class members; (3) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class members' PII/PHI; (4) protect Plaintiffs' and Class members' PII/PHI in compliance with federal and state laws and regulations, industry standards, and HCSC's representations; and (5) maintain the confidentiality of Plaintiffs' and Class members' PII/PHI and protect it from unauthorized access, disclosure, theft, and misuse; and (6) share Plaintiffs' and Class members' PII/PHI only with third parties that utilize reasonable data security measures, comply with federal and state laws and regulations, industry standards and HCSC's representations, and maintain the confidentiality of PII/PHI and protect it from unauthorized access, disclosure, theft, and misuse.

150. The protection of PII/PHI was a material term of the implied contracts between Plaintiffs and Class members, on the one hand, and HCSC, on the other hand. Indeed, as set forth *supra*, HCSC recognized the importance of data security and the privacy of their customers' PII/PHI in its Privacy Notice. Had Plaintiffs and Class members known that HCSC would not adequately protect their PII/PHI, including by sharing their PII/PHI with third parties that failed to have adequate security measures in place, they would not have agreed to provide HCSC with their PII/PHI or received insurance services HCSC.

151. Plaintiffs and Class members performed their obligations under the implied contract when they provided HCSC with their PII/PHI and paid for insurance services from HCSC.

152. HCSC breached its obligations under its implied contracts with Plaintiffs and Class members in failing to, or sharing PII/PHI with third parties that failed to, implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain reasonable security protocols and procedures to protect Plaintiffs' and Class members' PII/PHI in a manner that complies with applicable laws, regulations, industry standards, and HCSC's representations.

153. HCSC's breach of their obligations of its implied contracts with Plaintiffs and Class members directly resulted in the Data Breach and the injuries that Plaintiffs and all other Class members have suffered from the Data Breach.

154. Plaintiffs and all other Class members were damaged by HCSC's breach of implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a

well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

## COUNT IV
## UNJUST ENRICHMENT

155. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

156. This claim is pleaded in the alternative to the breach of implied contract claim.

157. Plaintiffs and Class members conferred a monetary benefit upon Defendants in the form of monies paid to HCSC for insurance services and through the provision of their PII/PHI, which HCSC in turn used to pay Conduent for its services. Plaintiffs did so with an implicit understanding that Defendants would use some of these payments or profits from their labor to protect the PII/PHI they collect, store, and share.

158. Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiffs and Class members. Defendants also benefitted from the receipt of Plaintiffs' and Class members' PII/PHI, as this was used to facilitate their business operations and billing services.

159. As a result of Defendants' conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that they paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

160. Defendants should not be permitted to retain the money belonging to Plaintiffs and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

161. Plaintiffs and Class members have no adequate remedy at law.

162. Defendants should be compelled to provide for the benefit of Plaintiffs and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## COUNT V
## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
**Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")**
***On Behalf of Plaintiff Kliner and the California Subclass***

163. Plaintiff Kliner realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

164. Plaintiff Kliner brings this claim on behalf of himself and the California Subclass against Defendants.

165. The UCL prohibits any "unlawful" or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendants engaged in unlawful, unfair, and fraudulent practices within the meaning, and in violation of, the UCL.

166. In the course of conducting its business, Defendants committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff Kliner's and California Subclass members' PII/PHI, and by violating the statutory and common law alleged herein, including, *inter alia*, Section 5 of the FTCA, HIPAA Privacy and Security Rules, and Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiff Kliner and California Subclass members reserve the right to allege other violations of law by Defendants constituting other unlawful business acts or practices. Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

167. Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also

constitute "unfair" business acts and practices in violation of the UCL in that Defendants' wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendants' practices are also contrary to legislatively declared and public policies that seek to protect PII/PHI and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as Article I, Section 1 of the California Constitution (California's constitutional right to privacy), HIPAA Privacy and Security Rules, and Section 5 of the FTCA. The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

168. The injury and harm that Plaintiff Kliner and California Subclass members suffered was the direct and proximate result of Defendants' violations of the UCL. Plaintiff Kliner and California Subclass members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to

mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) loss of value of the PII/PHI that was compromised in the Data Breach; and (viii) overpayment for the services that were received without adequate data security.

169. Unless restrained and enjoined, Defendants will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff Kliner, California Subclass members, and the general public, also seek restitution and an injunction prohibiting Defendants from continuing such wrongful conduct, and requiring Defendants to modify their corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII/PHI entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

## COUNT VI
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
## 815 ILCS 505/2, *et seq.* ("ICFA")
***On Behalf of Plaintiff Hayes and the Illinois Subclass***

170. Plaintiff Hayes realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

171. Plaintiff Hayes brings this claim on behalf of himself and the Illinois Subclass against Defendants.

172. Defendant HCSC offered and continues to offer insurance services in the State of Illinois. Defendant Conduent offered and continues to offer business services in Illinois.

173. Plaintiff Hayes and Class members received insurance services from HCSC for personal, family, or household purposes.

174. Defendants engaged in unlawful and unfair practices in violation of the ICFA by failing to, or sharing PII/PHI with third-party vendors who failed to, implement and maintain reasonable security measures to protect and secure Plaintiff Hayes's and Illinois Subclass members' PII/PHI in a manner that complied with applicable laws, regulations, and industry standards.

175. Defendants' duties also arise from the Illinois Personal Information Protection Act, 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS 530/45. Defendants violated this duty by failing to, or sharing PII/PHI with third parties that failed to, implement reasonably secure data security policies.

176. Defendants further violated ICFA by failing to notify Plaintiff Hayes and Illinois Subclass members of the Data Breach in a timely manner. The Illinois Personal Information Protection Act requires entities that experience a data breach to notify Illinois residents "in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10. Violation of the Illinois Personal Information Protection Act constitutes an unlawful practice under ICFA. 815 ILCS 530/20.

177. Due to the Data Breach, Plaintiff Hayes and Illinois Subclass members have lost property in the form of their PII/PHI. Further, Defendants' failure to, or sharing PII/PHI with third parties that failed to, adopt reasonable practices in protecting and safeguarding Illinois Subclass members' PII/PHI will force Plaintiff Hayes and Illinois Subclass members to spend time or money to protect themselves against identity theft. Plaintiff Hayes and Illinois Subclass members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Defendants' practice of collecting, sharing, and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

178. As a result of Defendants' violations of ICFA, Plaintiff Hayes and Illinois Subclass members have suffered and will suffer injury, including, but not limited to: ((i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses

associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) loss of value of the PII/PHI that was compromised in the Data Breach; and (viii) overpayment for the services that were received without adequate data security.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. Certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B. Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendants from experiencing

another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: November 18, 2025

Respectfully submitted,

*/s/ James E. Cecchi*

James E. Cecchi
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel.: (973) 994-1700
jcecchi@carellabyrne.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630

Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiffs*

**Pro hac vice* forthcoming